IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 6, 2018

## STATE OF TENNESSEE v. WINDALL SHERELL EDWARDS aka "WOO"

**Appeal from the Circuit Court for Tipton County**
No. 8456      Joe H. Walker, III, Judge

_____

### No. W2018-00145-CCA-R3-CD

_____

Defendant, Windall Sherell Edwards, also known as "Woo," was convicted by a jury of first degree murder, theft of property valued at $500 or less, and felon in possession of a weapon. He was sentenced to an effective sentence of life without the possibility of parole. Defendant appeals the judgments of the trial court, arguing that the evidence was not sufficient to prove premeditation for the first degree murder conviction. Because we conclude that the evidence was sufficient, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Brian R. Huffman (at trial and on appeal) and Jeremy Armstrong (at trial), Covington, Tennessee, for the appellant, Windall Sherell Edwards.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Mark E. Davidson, District Attorney General; and James Walter Freeland, Jr., and Lindsey Williams (at trial), and Jason Poyner (at motion for new trial), Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Defendant was indicted by the Tipton County Grand Jury for theft of property valued at $500 or less, first degree murder, possession of a weapon by a convicted felon, employing a firearm during the commission of a dangerous felony, and employing a

firearm during the commission of a dangerous felony having been previously convicted of a dangerous felony, for events that took place in August of 2015.

Chrystal Weathers, the victim, and Defendant lived together at Canterbury Apartments in Covington with three children. The oldest child was the victim's daughter, K.W.,[1] who was eleven years old at the time. The two youngest children were boys, who were three and five years old. The oldest boy was the son of the victim. The youngest child was the product of Defendant's relationship with the victim. Defendant had lived with the victim for about four years at that time.

On the morning of August 25, 2015, after getting the two oldest children off to school, the victim was supposed to spend the day with her sister, Felicia Weathers. Ms. Weathers lived about two buildings away in the same apartment complex as the victim. When the victim did not arrive as expected, Ms. Weathers drove over to the victim's apartment and "blowed [her horn] a couple of times." The victim did not come outside so Ms. Weathers sent her a text message. The victim still did not come outside. So, Ms. Weathers went to the apartment. The door was cracked, and Ms. Weathers could see that Defendant was in the apartment with the victim. Ms. Weathers could hear Defendant yelling at the victim. The victim eventually left the apartment with her sister, while Defendant and "the baby boy" remained at the apartment. Ms. Weathers and her sister spent the day together. Defendant left the apartment at some point that morning. At that time, the location of the youngest child is unclear. Around 1:00 or 2:00 p.m., Ms. Weathers "went back and picked [Defendant] up" at his mother's house. Ms. Weathers drove Defendant to a "loan company" where she dropped him off before eventually picking Defendant up at a Mapco gas station and returning him to his mother's house.

Ms. Weathers and the victim got back to the apartment around 3:30 p.m. in anticipation of the victim's two oldest children getting home from school. The women planned on getting "back together after the kids came in from school, because it was [their] daddy['s] birthday" and there was a barbecue at his house around 5:00 p.m. After getting home, the victim called Ms. Weathers to inform her that she was not going to the barbeque.

Ms. Weathers went to bed around 9:30 or 10:00 p.m. Her boyfriend, Jeremy Edwards, was also at the house along with his daughter. Mr. Edwards is Defendant's brother. Ms. Weathers woke up to K.W. beating on her door. K.W. was in an "outrage," was hollering and crying that Defendant "shot her mama." Ms. Weathers grabbed her phone, headed down the stairs, and called 911. When she got to the bottom of the stairs,

---

[1] It is the policy of this Court to refer to minors by their initials.

she saw her two young nephews. The youngest child "had blood on his hands and on the front of his shirt" and "on his forehead."

Ms. Weathers heard Defendant threaten the victim on the Monday two days prior to her death. At the time, the victim was at Ms. Weathers's apartment. The front door was open, but the screen door was closed and locked. Defendant came to the door and asked the victim to come outside. The victim eventually went to the door but did not go outside. She told Defendant if he hit her that he was going to go to jail. Ms. Weathers heard Defendant say he was "not going to jail for hitting [the victim] no more, [he was] going to jail for killing [her]."

K.W. explained that the day prior to her mother's death, her mother went out with friends. Defendant was not at the house at the time. After the victim left the house, Defendant came to the door and "started beating on the door." He told K.W. that he was "coming in to get his stuff, then he was going to leave." He came in to the house, got his gun out of the closet in the victim's bedroom, and placed it in his pocket.

On the day that her mother was killed, K.W. came home from school that afternoon as usual. Defendant was at the apartment. K.W. cleaned herself up and went to her bedroom where she fell asleep. She awakened to Defendant and her mother arguing loudly. This upset K.W., and she started crying. The victim heard K.W. crying and came to her room to check on her before the victim assured her that K.W. was going to be alright. Defendant eventually left the apartment, and the victim called the police. The police came to the house. K.W. recalled talking to the police that night. She described what she observed between Defendant and the victim and told police she did not see Defendant touch the victim. Once the police left the house, K.W. went back to sleep. Sometime later that night, K.W. "woke up again and [her mother] was standing at the [front] door" to the house. She heard the victim talking to Defendant at the door. "She told him not to come in acting stupid because her kids were asleep." The victim let Defendant in the house.

K.W. heard arguing again. She left her room and stood in the middle of the hallway. Defendant saw K.W. standing there, but he did not talk to her. K.W. could tell that her mother was "afraid" because of the "way she was backing up and looking at him." K.W. saw Defendant grab the victim's phone out of her hand before he pushed her. K.W. screamed. Defendant "came down the hallway, . . . [told her to] shut up, and he put his hands over [her] mouth." The victim told Defendant to stop. K.W. saw Defendant "push[] [the victim] against the wall, and he punched her in the face." Defendant told the victim, "I got a way to end all this," before walking toward the kitchen. K.W. was afraid that Defendant was going to the kitchen to get his gun because

that is where she thought he kept the gun. K.W. saw the victim walk toward her bedroom before she turned around to get in front of K.W.

At that point, K.W. ran out the open front door of the apartment into the dark. As she left through the open door, she glanced back at the house and could see that Defendant and the victim were still arguing, "tussling back and forth." K.W. saw the victim jump on Defendant's back. K.W. was scared and planned to run to her Aunt Felicia's place nearby so that she could call the police. K.W. heard the victim tell Defendant to "stop, stop, stop." K.W. heard her mother call her nickname. Defendant told her to "shut up" before slamming the door. K.W. stopped running and turned back toward the door when she heard five gunshots. After K.W. heard the shots, she started running again. She ran to her aunt's apartment door, knowing that her brothers were still in the apartment with Defendant and the victim. When K.W. left the apartment, the "baby boy" was on a mattress in the front room where the victim and Defendant were arguing. She told her aunt, Ms. Weathers, that "he shot her." K.W. was crying and upset.

Officer David Morgan with the Covington Police Department first responded to a call at the victim's apartment around 1:00 a.m. on August 26, 2015. He was accompanied by Officer Mike Short. Officer Morgan made contact with the victim in the breezeway. She appeared to be the only adult there at the time, but Officer Morgan did not enter the apartment. Officer Morgan did not recall seeing any children.

Officer Morgan and several other officers responded to a second call summoning them to the apartment around 4:00 a.m. This time there was a report of shots fired. When he arrived, another officer was talking to a child in the parking lot. Officer Morgan was directed to the apartment. When he arrived, he could see "[a] female laying on the floor" inside the door frame. It was the victim. A gun was found on the floor between the victim's feet.

Rosie Danos, Defendant's aunt, lived in Brighton, Tennessee on the date of the victim's death. Around 7:00 a.m. that morning, several police officers came to her house to ask questions about Defendant. The police asked permission to search her property. She complied, and the police began their search.

Deputy Tremaine Reed assisted in the search for Defendant at the Danos residence. The last place to be searched was the carport. There was a small utility room. When Deputy Reed opened the door, it "was somewhat barricaded with some type of object behind the door." As the door opened, Deputy Reed saw Defendant "hiding behind the interior door with a hood over his head." Defendant came out of the utility

room and was arrested by officers soon thereafter. While en route to the jail, Defendant spoke to the officer in the police car. He asked about the victim, inquiring whether she "made it." Once at the jail, Defendant was interviewed by officers. He explained that he and the victim were arguing about text messages on her cell phone when the victim came at him with his own gun. Defendant took the gun away from the victim, hit her with the gun, and then shot her. He admitted that he panicked and shot more than once before running from the apartment.

Dr. Paul Benson performed an autopsy on the victim, who was twenty-nine years of age at her death. The victim was struck by six bullets but sustained a total of seven gunshot wounds – two to the back of the head, one to the back of the right forearm, one to the right thigh and abdomen, one to the left thigh, one to the left breast, and a series of graze wounds to the to the left lower extremity and left shin/knee. According to Dr. Benson, three of the gunshot wounds in and of themselves would have been fatal. The victim also had two blunt force injuries to the head. Both of the blunt force injuries resulted in "half-moon shaped skull fracture[s]." The fractures were located on both the front and back of the victim's head. Dr. Benson concluded that the skull fractures "matche[d] the front of the muzzle of the firearm." Based on an analysis of the fracture pattern in the victim's skull, Dr. Benson opined that the blunt force injuries occurred prior to the gunshot wounds. The cause of the victim's death was determined to be multiple gunshot wounds and the manner of death was homicide.

Mark Reynolds, a special agent with the Tennessee Bureau of Investigation, testified that the gun recovered from the scene was a Smith & Wesson .357 caliber revolver with a chrome finish. Special Agent Kaisa Lynch was certified as a firearm examination identification expert. In her expert opinion "all six of those bullets and bullet jackets [recovered from the victim and the scene] had been fired in this revolver [recovered from the scene]."

Joshua Osborne testified that he owned the Smith & Wesson .357 that was recovered from the scene of the crime. According to Joshua Osborne, the gun was stolen by his brother while he was out of town in May of 2015. His brother, Matthew Osborne, was incarcerated for the offense and admitted to Joshua Osborne that he traded the gun for drugs from a person who identified himself as Devon Bolton. Matthew Osborne did not identify Defendant as the man who claimed he was Devon Bolton.

Defendant testified that he and the victim had an "up and down relationship." The day of the victim's death, the two were arguing about "something [he saw] in her phone." He admitted that he "got mad." Defendant explained that he was gone all day, and the victim was mad at him for not being home. However, when he finally got home, the victim was gone. The children were home by themselves. When the victim eventually

returned, they argued, and he left. Later that night, he "called her, and . . . asked her to let [him] come back and all that stuff."

Defendant returned to the house. Once he got there, the victim got a text message on her phone. Defendant "snatched her phone from her" and asked her who was sending her text messages. Defendant admitted that they argued. The victim went to the back room. According to Defendant, "when she came back in, she had the gun in her hand." The victim and Defendant started "tussling." Defendant took the gun from her, "hit her with the gun," and then shot her. He was "mad" when he saw the number on the victim's phone and "snapped." He "just kept shooting" and claimed that he blacked out. Defendant acknowledged that all three of the kids were in the apartment but disagreed that the youngest child was asleep on the mattress on the floor at the time he shot the victim. Defendant admitted that he ran after he shot the victim because he was "scared."

Defendant admitted that the gun was his but claimed he received it as a gift from a man he knew only as "Bull" so that he could protect himself based on his status in the "GD."[2] On cross-examination, Defendant admitted that he did not accidentally pull the trigger. Defendant explained again that he shot the victim because he was "mad." Defendant admitted that he called his niece after he ran from the apartment, told her he "messed up," and asked her to drive him to his aunt's house.

The jury found Defendant guilty of first degree murder and theft, related to the gun used in the crime. In a bifurcated hearing, the jury found two aggravating factors, and Defendant was sentenced to life without parole. The jury also found Defendant guilty of possession of a handgun by a convicted felon.[3] As a result, Defendant was sentenced to an effective sentence of life without the possibility of parole. Defendant filed a motion for new trial. The trial court denied the motion, and Defendant appealed to this Court.

*Analysis*

On appeal, Defendant challenges the sufficiency of the evidence for the first degree murder conviction. Defendant does not challenge his other convictions or his sentence. Specifically, Defendant argues that the State did not prove premeditation because the circumstances set forth in *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013), which juries can use to determine if premeditation exists, do not

---

[2] There was not an explanation for the initials "GD" during the testimony of Defendant.

[3] According to the judgment forms in the record, the charges of employing a firearm during the commission of a dangerous felony and employing a firearm during the commission of a dangerous felony having been previously convicted of a dangerous felony were "dismissed/nolle prossed."

support a finding of premeditation in this case. The State disagrees, arguing that Defendant "clearly exercised reflection and judgment" prior to the victim's death and that the proof "overwhelmingly" supported the conviction for first degree murder.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-106(a)(18). Premeditation is defined as "an act done after the exercise of reflection and judgment." T.C.A.§ 39-13-202(d). This section further defines premeditation as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* The State must establish the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). The existence of premeditation is a question of fact for the jury and may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Such circumstances include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, threats or declarations of an intent to kill, a lack of provocation by the victim, failure to aid or assist the victim, the procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *Bland*, 958 S.W.2d at 660; *Larkin*, 443 S.W.3d at 815-16.

In the light most favorable to the State, the proof shows that Defendant threatened to kill the victim twice before the shooting. On the night of the incident, Defendant and the victim were arguing when Defendant hit the victim so forcefully in the head with the gun that it fractured the victim's skull and left an indention matching the outline of the gun in her head. Defendant then shot the unarmed victim with a revolver a total of six times before leaving the apartment. Two of the shots were to the back of the victim's head. Several young children were in the apartment at the time. Defendant did not attempt to help the victim. Instead, he ran away from the scene and hid from the police. Defendant testified that he saw "red" and "snapped" during his argument with the victim, and he argues that his emotional response indicates that his actions were not premeditated. However, the assessment of the evidence was within the jury's province, and we will not disturb that determination on appeal. *See Bland*, 958 S.W.2d at 659. Defendant insists that the circumstances set forth *Larkin* do not support premeditation. Specifically, Defendant argues that he was provoked by the victim; did not directly threaten the victim's life but merely made "vague statements" prior to the killing that were not indicative of premeditation; did not fail to render aid to the victim but merely ran from the scene; did not have a motive to kill the victim; did not subject the victim to any particular cruelty; did not procure the weapon for the purpose of killing the victim; did not attempt to conceal the crime; did not destroy evidence after the crime; and did not appear to be calm after the killing. Further, Defendant argues that use of a deadly weapon alone does not support a finding of premeditation. We disagree. The circumstances of the victim's death support the jury's determination that the killing was premeditated. The evidence was more than sufficient to support the conviction.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.


_____
TIMOTHY L. EASTER, JUDGE